2022 IL App (1st) 192241-U

No. 1-19-2241

Order filed July 22, 2022

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 00 CR 24509 |
| | ) | |
| CORDELLUS MCMURTRY, | ) | Honorable |
| | ) | Carl B. Boyd, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court.
Justices Ellis and Mikva concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the trial court's dismissal of defendant's postconviction petition following an evidentiary hearing where defendant failed to support his actual innocence claim and where defendant's plea counsel was not ineffective by providing him with the proper sentencing credit calculation.

¶ 2    Following a bench trial, defendant Cordellus McMurtry was found guilty of the September 20, 2000, attempted murder of Robert White and sentenced to 30 years' imprisonment (00 CR 24509). He was also found guilty of first degree murder in the shooting death of Omoteji Barnes

(decedent) and sentenced to a consecutive prison term of 45 years (01 CR 8580). While awaiting trial on those cases, defendant was indicted for solicitation to commit murder (04 CR 290) and he pled guilty in a negotiated plea to a reduced charge of attempted murder on December 10, 2010. Defendant was subsequently sentenced to an agreed upon term of 13 years' imprisonment, to be served consecutive to his 30-year sentence for attempted murder. On direct appeal, we affirmed defendant's attempted murder conviction and sentence but reversed his murder conviction and remanded for a new trial. *People v. McMurtry*, No. 1-06-2657 (2009) (unpublished order under Illinois Supreme Court Rule 23). Defendant did not file a direct appeal from his negotiated guilty plea.

¶ 3    On appeal, defendant contends that the trial court erred by denying his postconviction petition after an evidentiary hearing: (1) based on actual innocence where the court used a legally impermissible actual innocence standard and where the new evidence made it more probable than not that the jury would reach a different result at a new trial, and (2) based on ineffective assistance of counsel related to his guilty plea because he received incorrect legal advice about the calculation of credit for time served. For the following reasons, we affirm.

¶ 4                                I.  BACKGROUND

¶ 5                     A. Trial Proceedings (00 CR 24509)

¶ 6    Our recitation of the facts comes from this court's decision on defendant's direct appeal. The evidence presented at defendant's trial indicated that on September 20, 2000, at approximately 9 p.m., White was riding in his car with a friend, Crystal, when he received a phone call from decedent who asked him to come over and check out a car that decedent installed a television into. White drove to the parking lot next to decedent's two-story apartment building on Main Street in

Chicago Heights, and saw decedent installing a television into an older model blue Buick. No one else was in the parking lot. Decedent told White that the car belonged to "Honey," whom White later learned was defendant. White recognized the blue Buick from around the neighborhood and knew defendant by reputation but not personally. Decedent asked White to get them some food from a nearby restaurant, and White and Crystal left. When they returned, decedent was gone and so was the blue Buick.

¶ 7     White and Crystal remained in their car for a few minutes before White honked the horn several times and yelled decedent's name. White then exited his car and yelled up to decedent's second-floor window while calling decedent's name. White then called decedent's cell phone but hung up just before the voicemail came on and tossed the phone on his car seat. White then saw a man he thought was decedent come around the corner of the building and the motion detector light near decedent's window was activated. White started walking towards the man, but realized that it was not decedent when he got within about 18 feet of the man. He identified the man in court as defendant. Defendant pointed a gun at White and said "B*tch, get back in the car." When White paused, defendant cocked the gun and pulled the trigger. However, the gun misfired. White ducked, ran back to the car, grabbed his keys and cell phone, and told Crystal to run. He and Crystal ran in different directions as defendant again cocked the gun. White heard several gunshots as he ran. White ran three or four houses down, jumped a fence and hid under a porch before calling 911. White testified that he told the dispatcher that the shooter was wearing a blue coat with letters on it that spelled out either New York or Chicago but the jacket was unzipped so he was not certain. The recording of the 911 call indicated that White told described the shooter as wearing a blue New York coat.

¶ 8     When police arrived, White described what happened and went to check on decedent. The front door to decedent's apartment was cracked open and the apartment had been "trashed." White found decedent's body on the floor in the bedroom. Decedent's eyes were covered by duct tape wrapped around his head and he suffered fatal gunshot wounds to his body and head. White ran outside and told police to call an ambulance.

¶ 9     At approximately the same time White ran from the gunshots, Tricia and John Makowski were in their bedroom at their home on Euclid Avenue when they heard gunshots coming from the corner of Euclid and Main. Tricia called 911 and reported gunshots. After she hung up, Tricia saw a shadow run past in the yard through her bedroom window. Tricia told John and they both went to the living room window where they saw two black men running through the yard on the side of the house towards the sidewalk. When the men reached the sidewalk, they stopped running and walked across the street. Tricia testified that the taller man had a high haircut and wore a blue jumpsuit while the shorter man wore a shiny red baseball jacket. Tricia and John watched the men walk down 21st Street until they lost sight of them. Shortly thereafter, Tricia and John heard car doors shut and saw headlights come on and approach their house from the same direction the two men had walked. As the car approached and passed their home, Tricia recognized it as an older model blue Buick Skylark from the neighborhood. Tricia and John testified that the two occupants of the Buick had on the same clothing as the two men who had just run past their home; the driver wore a blue jumpsuit and the passenger wore a shiny red baseball jacket. The Buick turned south on Euclid where a police car pulled it over. John then returned to the bedroom and Tricia went to the kitchen, thinking that the police had responded to her 911 call and had control of the situation.

Minutes later, Tricia looked out of the window and saw that the police allowed the two men in the Buick to drive off.

¶ 10    Chicago Heights police officer Christina Benton testified that on September 20. 2000, at approximately 10:30 p.m., she responded to a call of shots fired near Euclid and Main. As Officer Benton went to the area in a marked squad car, she received a second radio dispatch advising that there were two black males driving east on 21st Street, one wearing a blue jumper and the other wearing a red jacket. When she arrived to 21st Street, Officer Benton saw a blue Buick heading westbound toward Euclid. She knew the car and recognized defendant as the driver, but did not recognize the passenger. There were no other vehicles on the road. Officer Benton followed the Buick and called for backup. Officer Clinton Wagner responded to the call and pulled his squad car behind Officer Benton, who then activated her squad car's Mars lights and pulled defendant over.

¶ 11    Defendant exited the Buick and approached Officer Benton saying, "come on Troc [*sic*], give me a break."[1] Defendant was sweating and breathing heavily. Officer Benton told defendant that she received a call of shots fired and was handcuffing him for her own safety. She handcuffed defendant and placed him in the back of her squad car. Defendant was wearing an all-blue outfit.

¶ 12    Meanwhile, Officer Wagner approached the passenger side of the Buick and ordered the passenger out of the vehicle. Officer Wagner learned that the passenger was Taiwan Parker. Parker wore a white t-shirt and blue jeans, was sweating profusely and breathing heavily. Parker was handcuffed and placed in the back of the Buick.

---

[1] At that time, Officer Benton's last name was Trock.

¶ 13    Within 30 minutes of the traffic stop, a sergeant arrived and ordered the officers to release defendant and Parker. After doing so, Officers Benton and Wagner drove to the shooting scene to help secure the area.

¶ 14    At approximately midnight, White went to the police station and identified defendant's photo from a photo array. The following day, Detective Lewis Allessandrini received information that defendant might be staying at the Hacienda Inn Hotel in Chicago Heights. He went to the hotel and saw defendant's Buick parked at the north end of the parking lot. Detective Allessandrini and his partner surveilled the hotel, and at approximately 2:42 a.m. on September 21, 2000, defendant entered the Buick and drove off alone. The detectives radioed a waiting police unit before following defendant's vehicle northbound on Dixie Highway. The police unit and detectives stopped defendant and arrested him. Later that day, White identified defendant from a lineup as the person who shot at him.

¶ 15    Cynthia Presock, known as "New York," was a multiple convicted felon who admitted to having a 15-year addiction to crack cocaine. She was in the Cook County jail on a charge of criminal trespass to land at the time of defendant's trial. She testified that she knew defendant. In her written statement to Detective Joseph Bruni, she stated that on the date of the shootings, she was staying at the Hacienda Inn Hotel in Chicago Heights in one of several rooms that defendant rented for his illegal drug trade. At the time, Presock was using her boyfriend's white Cavalier, and stated that she often lent the car to defendant. According to her written statement, on a date in September 2000, between 10 and 11 p.m., she saw defendant and four other men get into her car and leave the parking of the hotel. One of the men was Parker, the others were Deon Adams, known as "Shorty Buck," Terry Martin and someone whose last name was Hardy. A short time

later, while Presock was in a hotel room with Adams, Martin and Hardy, defendant returned to the hotel driving his blue Buick with Parker in the passenger seat. Defendant gave Presock the keys to her car and told her where she could retrieve it after telling her that he was forced to abandon it behind a house because someone had been shooting at him. Another man then came to the hotel room carrying something wrapped in his coat. Defendant and the man went into the bedroom together before the man left and defendant sat on the bed.

¶ 16    The next morning, Presock went to retrieve her car from the parking lot of an apartment building located on Euclid and 19th or 20th Street. A large police wagon was parked near the apartment building and yellow police tape was wrapped around some trees. She entered her car and drove away.

¶ 17    On September 21, 2000, at approximately 1 a.m., Illinois State Trooper Patrick Phillips processed the crime scene in and around decedent's apartment. The trooper recovered a spent shell casing and some crumpled duct tape from a grassy area outside of the apartment building. He also recovered a roll of duct tape from the sidewalk. There were no signs of forced entry into the apartment. In the kitchen area, cabinet doors and drawers were open and various items were scattered across the counter. Decedent was found lying on the bedroom floor with duct tape around his eyes and face. A safe in the bedroom was open and contained floppy disk drives, VCR tapes and two boxes of pistol cartridges. The trooper recovered one live round near the entrance door to the apartment and another inside the bedroom door. He also recovered spent shell casings from decedent's crotch, near decedent's head, one near the safe, and another from under the bed. A fired bullet was recovered from decedent's left jacket pocket and another from under the bed. All of the shell casings and bullets were .380 automatic caliber.

¶ 18    In the top drawer of the bedroom dresser, the trooper found an unloaded silver and black Browning handgun along with boxes of ammunition and a plastic baggy containing 15 small blue sealed packages of white powder. Fingerprints and latent fingerprints were recovered from the apartment. The trooper also found a surveillance system in the apartment which monitored the parking lot. Later that day, Trooper Phillips was called to administer a gunshot residue (GSR) test on defendant. He did so, even though the GSR test is normally administered within six hours after a shooting since gunshot residue is easily wiped off through washing, sweat or contact with other surfaces. The GSR test was negative.

¶ 19    Illinois State Trooper Pamela Janecek, a crime scene investigator, examined defendant's car after his arrest. She found a television on the vehicle's front seat and loose wires hanging from under the dashboard. Trooper Janecek also attended decedent's autopsy. She inventoried duct tape taken from his head, wrists, hands, and eyes. The parties stipulated that a latent fingerprint recovered from the duct tape found around decedent's head matched Parker. Another print recovered from the roll of duct tape found on the sidewalk outside of decedent's apartment also matched Parker. Sometime later, Trooper Janecek went to a house located at 91 West 21st Street in Chicago Heights to recover a handgun that some kids found while playing outside near a tree. The barrel of the gun was packed with dirt and the magazine was partially removed from the gun. Tests revealed that the four shell casings and the two fired bullets recovered from decedent's apartment were fired from the handgun. Outside of that residence, Trooper Janecek recovered a piece of duct tape in the grassy area in the front yard and another piece near the tree where the kids found the gun. She then walked to 81 West 21st Street where she recovered another piece of duct tape.

¶ 20    On October 20, 2000, Officers Benton and Wagner viewed a lineup and identified Parker as the passenger riding in defendant's car shortly after the shooting.

¶ 21    On April 28, 2003, George Frazier, a multiple convicted felon, was in the bullpen at the Markham police lockup when he overheard defendant talking about his case. According to Frazier, defendant was complaining that New York (Presock) and Shorty Buck (Adams) were scheduled to testify against him. Frazier recognized the names and informed defendant that he was in lockup for a probation violation but would be released in a couple of days. Frazier asked defendant what it would mean to him if the two witnesses failed to show up at court to testify against him. Defendant then pulled him aside and they had a private conversation. Frazier asked defendant if he just wanted the witnesses kidnapped or killed. According to Frazier, defendant wanted them killed. Frazier negotiated a price of $5000 for each. Defendant gave Frazier his mother's phone number and instructed him to call her once he was released from the lockup. Frazier agreed to visit defendant after he was released for further discussion of the matter.

¶ 22    On May 2, 2003, Frazier contacted the State's Attorney's Office in an effort to make a deal for himself. He agreed to assist the State by consenting to wear a wire or recording device while speaking with defendant and his mother. Thereafter, the court granted Frazier an I-bond on his pending cases. In exchange for wearing the wire, the State terminated Frazier's probation for possession of a controlled substance and burglary; agreed to reduce his pending charge from possession with intent to simple possession with an agreed sentence of 24 months' probation; and quashed a traffic warrant.

¶ 23    Frazier recorded conversations he had with defendant on June 16 and 17, 2003, and July 15, 2003. The tapes were played in court; however, only the tapes and transcripts of Frazier's conversations with defendant were admitted into evidence.

¶ 24    On cross-examination, Frazier testified that his initial plan was to contact the State's Attorney's Office to try and work out a deal for himself, arrange to have the witnesses killed, and then use the State's Attorney's Office as a cover and alibi for the killings. He believed that if he was working for the State he would not be a suspect in the murder investigations. Frazier testified that he changed his mind about doing the hits after he saw New York, who he had previously dated.

¶ 25    After the State rested, the trial court directed a finding of not guilty on the first degree murder charges based on armed robbery and aggravated kidnapping. The court denied defendant's motion on the remaining counts.

¶ 26    Defense counsel called Detective Joseph Bruni to impeach the testimony of White and the Makowskis. Detective Bruni acknowledged that White told him that the shooter wore a "blueish jacket with some red in it," while his notes indicated that White said the shooter wore a red and blue jacket with some white lettering on it. Defense counsel questioned Detective Bruni as to how the Makowskis were able to identify defendant's face as he ran through their yard at night. Defense counsel also questioned how Tricia was able to identify defendant during the traffic stop through her kitchen window given the distance between her house and the stop location.

¶ 27    Defense counsel called Officer Paul Schmidt to impeach and rebut White's identification testimony of defendant. Officer Schmidt spoke with White at the scene of the shooting just after the police arrived. He described White as physically nervous, shaken, and scared. He testified that

White approached him in the parking lot and told him that the shooter was a black male wearing a blue and gray jacket. White also told Officer Schmidt that the gunman fired a semiautomatic handgun at him.

¶ 28   The trial court found defendant guilty of the first degree murder of decedent and guilty of the attempted murder of White.

¶ 29   On June 20, 2005, at a hearing on defendant's amended motion for a new trial, defense counsel informed the court that he might have rendered ineffective assistance of counsel by failing to object to the use of the secret audio recordings at trial pursuant to a recent appellate court decision, *People v. Brown*, 358 Ill. App. 3d 580 (2005). Defendant alleged that his sixth amendment right to counsel, which had attached, was violated when the State obtained incriminating statements from him in the absence of counsel through a hidden recording device worn by a confidential State informant, and that defense trial counsel was ineffective for failing to file a motion to suppress the secret audio recordings. The trial court subsequently agreed that use of the tapes was error, but concluded that it would have found defendant guilty even without the tapes. Defendant was then sentenced to consecutive terms of 45 years for first degree murder and 30 years for attempted murder. He appealed those convictions.

¶ 30   Meanwhile, Parker pled guilty to murder and aggravated kidnapping and was sentenced to 36 years' imprisonment on April 4, 2005.[2]

¶ 31                                B.  Direct Appeal

_____

[2] The transcript of Parker's plea hearing was admitted as an exhibit at defendant's evidentiary hearing.

¶ 32    On direct appeal, defendant contended that: (1) his sixth amendment right to counsel was violated when the State obtained incriminating statements from him in the absence of counsel through a hidden recording device worn by a confidential State informant and then introduced the tapes against him at trial; (2) trial counsel was ineffective for failing to file a motion to suppress the secret audio recordings; (3) trial counsel's ineffectiveness in this regard prevented him from making a knowing waiver of his right to a jury trial; and (4) trial counsel rendered ineffective assistance by failing to file a motion to suppress the identification of a codefendant who was riding with defendant in his car shortly after the shootings. This court found that admission of the tapes was not harmless beyond a reasonable doubt in terms of connecting defendant to decedent's apartment at the time of the murder, and reversed defendant's conviction for murder. However, we affirmed defendant's conviction for the attempted murder of White because the record did not indicate that the conviction was based on the same impermissible evidence the trial court relied upon in convicting defendant of murder. We denied his claims of ineffective assistance of counsel. This court affirmed defendant's conviction and sentence for attempted murder but reversed and remanded for a new trial on the first degree murder charge in September 2009.

¶ 33                              C. Guilty Plea (04 CR 290)

¶ 34    Defendant was subsequently charged with solicitation for murder. In December 2010, defendant entered a negotiated guilty plea to a reduced charge of attempted murder and received a sentence of 13 years' imprisonment. The trial court admonished defendant at the plea hearing that his 13-year sentence would run consecutive to the 30-year sentence he was then serving for the attempted murder case. The court indicated to defendant the credit that he was entitled to receive, 2580 days, and ensured that defendant understood that he would not receive duplicate credit for

time served in pretrial custody. The mittimus in the solicitation case also reflected that defendant was to receive credit for time actually served in custody for a total of 2580 days.

¶ 35                                D.  Postconviction Proceedings

¶ 36    On March 30, 2010, defendant filed a *pro se* postconviction petition in which he raised allegations of ineffective assistance of trial and appellate counsel. Of relevance to this appeal, defendant argued that his trial counsel failed to investigate or interview his codefendants, Deon Adams and Terry Martin, when there was exculpatory evidence available. Specifically, the petition stated that "Terry Martin the state obtained a confession from Mr. Martin, stating he was the shooter, who shot at Robert White." Defendant's *pro se* petition also included an unsworn affidavit, purportedly submitted by Adams, dated March 6, 2001, which stated that defendant had nothing to do with this case and was erroneously implicated due to his testimony given after threats by police and after being held in custody for a total of eight days.

¶ 37    Subsequently, postconviction counsel was appointed and the petition was amended; however, the record does not contain a copy of the amended petition. Based on the record, we have gleaned that the amended petition alleged that defendant's trial counsel was ineffective for not only providing him with inaccurate legal advice during his plea proceedings, but also for failing to file a motion to withdraw his plea.

¶ 38    The State filed a motion to dismiss the petition, amended on June 2, 2017, which the trial court denied and set the matter for an evidentiary hearing where defendant argued two claims: (1) actual innocence of the attempted murder of White and (2) ineffective assistance of counsel in connection with his guilty plea in the solicitation case.

¶ 39    At the February 2019 evidentiary hearing, defendant presented Parker's testimony in support of his actual innocence claim. Parker testified that although defendant drove him and the other men to decedent's apartment in Presock's car on the night of the murder, defendant advised them not to rob decedent and left in his own car before the other men committed the robbery. Parker stated that, while he and Adams went upstairs to decedent's apartment to rob him, Martin, who was armed with a gun, stayed on the ground floor to act as a lookout. Although Parker testified that he knew it was Martin who fired the shots at White, he admitted that he "didn't see anyone fire the gun" and never saw White at all. Parker also testified that he and Martin fled the scene together on foot, they saw defendant driving and flagged him down and defendant drove them back to the Hacienda Inn in his car. Martin was not allowed in defendant's car because he had a gun. Regarding his 2000 confession that implicated defendant, Parker claimed that he lied about defendant's involvement because the police told him that he would get less time if he implicated defendant. Defendant did not present Adams as a witness at the hearing, although his unsworn affidavit was attached to the original *pro se* petition.

¶ 40    Regarding his claim of ineffective assistance of counsel related to his guilty plea proceedings, defendant testified that his counsel advised him that he would be credited 2580 days of pretrial custody time served and the judge also told him that he would get credit for 2580 days. Defendant asserted that he based his guilty plea on advice that he would receive credit for 2580 days, time served, but he later learned that he would not receive credit for that time. Defendant testified at the hearing that his counsel told him that he would be granted "simultaneous custody," which he understood to mean credit for 2580 days.

¶ 41    However, the State introduced a copy of defendant's mittimus which reflected that defendant was entitled to a credit of 2580 days for time served in custody. Defendant acknowledged the mittimus and further stated that he was still serving his 30-year sentence for attempted murder and had not yet begun serving his consecutive sentence of 13 years in the solicitation case.

¶ 42    During closing arguments, defendant's postconviction counsel argued that Parker's testimony amounted to defendant's total exoneration. He also acknowledged that defendant's ineffectiveness claim was "confusing" and based on defendant's representation that an employee from the Illinois Department of Corrections (IDOC) told him that he would not receive the sentence credit.

¶ 43    The trial court denied both petitions in September 2019, finding that defendant failed to prove that he was actually innocent of White's attempted murder or that he received ineffective assistance of counsel during his plea proceedings. The court specifically found that Parker's recantation, which came almost 19 years after the crime, was not credible, and that it was the only evidence presented to support the claim of actual innocence. The court found that Parker's testimony was "nowhere near the level of credibility that would rise to total and complete exoneration, " noting that Parker waited 14 years after defendant's conviction to come forward. Finding that defendant had not met his burden, he denied defendant's request for postconviction relief on that issue.

¶ 44    With respect to the ineffectiveness of counsel claim, the trial court found that defendant made no showing of deficient performance by counsel and indicated that it was "at a loss" as to how he was prejudiced because the mittimus reflected that he received exactly the amount of credit

his counsel and the trial court told him that he would receive. The court also found that the record was clear that the sentencing court admonished defendant that the sentence was consecutive and that he was not going to get duplicate credit. The trial court concluded that defendant's plea was voluntarily and intelligently made according to the record and denied defendant postconviction relief on that issue.

¶ 45    This timely appeal followed.

¶ 46                                II.  ANALYSIS

¶ 47    On appeal, defendant contends that the trial court erred by denying his postconviction petition: (1) based on actual innocence where the court used a legally impermissible actual innocence standard and where the new evidence made it more probable than not that the jury would reach a different result at a new trial, and (2) based on ineffective assistance of counsel related to his guilty plea because he received incorrect legal advice about the calculation of credit for time served.

¶ 48                      A. General Postconviction Law/Standard of Review

¶ 49    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2010)) provides a method by which offenders serving their sentence can assert that their convictions were the result of a substantial denial of their rights under the United States or Illinois constitutions or both. *People v. Rivera*, 2016 IL App (1st) 132573, ¶ 17. A postconviction action is not an appeal from the judgment of conviction but is instead a collateral attack on the trial court proceedings. *Id.* Under the Act, a defendant bears the burden of establishing that a substantial deprivation of his constitutional rights occurred. *People v. Harper*, 2013 IL App (1st) 102181, ¶ 33.

¶ 50    In a non-capital case, a postconviction proceeding involves three stages. At the first stage, the trial court must review the petition within 90 days of its filing and dismiss the petition upon finding that it is frivolous or patently without merit. 725 ILCS 5/122-2.1(a) (West 2010). Where, as here, the review does not take place within 90 days, the petition advances to the second stage, where the trial court must docket the petition for further consideration. 725 ILCS 5/122-2.1(b) (West 2010).

¶ 51    At the second stage, counsel is appointed for the defendant if the defendant is indigent, and the State may answer or move to dismiss the petition. 725 ILCS 5/122-4, 5/122-5 (West 2010). By moving to dismiss the petition, the State challenges the sufficiency of the pleadings as a matter of law. *Rivera*, 2016 IL App (1st) 132573, ¶ 19. The circuit court's dismissal of a postconviction petition at the second stage is reviewed *de novo*. *Id.*

¶ 52    If the petition is not dismissed at the second stage, the proceedings advance to the third stage, where an evidentiary hearing is held and the defendant may present evidence in support of the petition. 725 ILCS 5/122-6 (West 2010). At a third-stage evidentiary hearing, the trial court acts as the finder of fact, determining the credibility of witnesses and the weight to be given particular testimony and resolving any conflicts in the evidence. *Rivera*, 2016 IL App (1st) 132573, ¶ 20. Throughout the second and third stages of proceedings under the Act, the defendant bears the burden of making a substantial showing of a constitutional violation. *Id.* Where fact-finding and credibility determinations are made during an evidentiary hearing, we will not reverse a trial court's decision unless it is manifestly erroneous. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). Manifest error is clearly evident, plain, and indisputable. *People v. Reed*, 2020 IL 124940, ¶ 51.

¶ 53 Issues that were decided on direct appeal are barred by the doctrine of *res judicata*, and issues that could have been raised on direct appeal, but were not, are deemed waived. *People v. Enis*, 194 Ill. 2d 361, 375 (2000). Waiver is not implicated, however, where a defendant's postconviction petition claim relies on evidence outside of the record. *Enis*, 194 Ill. 2d at 375-76.

¶ 54                                 B. Actual Innocence Claim

¶ 55 Defendant first contends that the trial court erred in denying his postconviction petition based on his assertion of actual innocence of the attempted murder. He argues that the trial court used a legally impermissible actual innocence standard and that the new evidence he presented, when viewed against the State's "scant" evidence, made it more probable than not that a jury would reach a different result at a new trial. Defendant maintains that there was no physical evidence or inculpatory statement that tied him to the attempted murder of White and his conviction rested on the false identification made by Parker and the inconsistent identification of White. At the evidentiary hearing, Parker recanted his previous identification of defendant as the shooter and identified the shooter as Terry Martin. Defendant contends that the "threadbare 'old' evidence" must be viewed against the new, noncumulative evidence supporting his actual innocence claim. Defendant further argues that the trial court violated his due process rights during the hearing by concluding that he failed to provide evidence that was a complete and total exoneration which was a higher standard than required.

¶ 56 In order to succeed on a claim of actual innocence, the defendant must present new, material, noncumulative evidence so conclusive that it would probably change the result on retrial. *People v. Coleman*, 2013 IL 113307, ¶ 96. New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. *Id.* Material means

the evidence is relevant and probative of defendant's innocence. *Id.* Noncumulative means the evidence adds to what the fact-finder heard. *Id.* And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. *Id.*

¶ 57 A claim of actual innocence is not the same as a claim of the insufficiency of the evidence or reasonable doubt or impeachment of trial witnesses, but a claim of vindication or exoneration. *People v. Gonzalez*, 2016 IL App (1st) 141660, ¶ 28. Probability, not certainty is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both old and new together. *Id.* At an evidentiary hearing, a defendant must prove his claim of actual innocence by a preponderance of the evidence. *Coleman*, 2013 IL 113307, ¶ 92.

¶ 58 Defendant appears to conflate the requirements for advancing a postconviction petition to third-stage proceedings with his burden of proof requirement at an evidentiary hearing and the trial court's function during an evidentiary hearing. As noted above, at an evidentiary hearing, the trial court acts as the finder of fact, determining the credibility of witnesses and the weight to be given particular testimony and resolving any conflicts in the evidence. *Rivera*, 2016 IL App (1st) 132573, ¶ 20. When such factual findings are made, we will not reverse the trial court's determination following an evidentiary hearing unless we find it to be manifestly erroneous. *Coleman*, 2013 IL 113307, ¶ 98. Thus, our inquiry is whether the trial court's determination that defendant failed to prove his claim of actual innocence by a preponderance of the evidence at the evidentiary hearing was manifestly erroneous.

¶ 59 As noted above, Parker testified at the evidentiary hearing that although defendant drove him and the other men to decedent's apartment in Presock's car on the night of the murder, defendant advised them not to rob decedent and left in his own car before the other men committed

the robbery. Parker testified that he knew it was Martin who fired the shots at White, but also stated that he "didn't see anyone fire the gun" and never saw White at all. Parker also testified that when he and Martin fled the scene together on foot, they saw defendant driving and flagged him down and defendant drove them back to the Hacienda Inn in his car. Martin was not allowed in defendant's car because he had a gun. Regarding his 2000 confession that implicated defendant, Parker claimed that he lied about defendant's involvement because the police told him that he would get less time if he implicated defendant. The record also contains a copy of the transcript from Parker's guilty plea proceedings in 2005, at which time he did not recant his implication of defendant's involvement from 2000. Also as noted above, defendant's *pro se* petition also included an unsworn affidavit purportedly from Adams dated March 6, 2001, in which he averred that defendant had nothing to do with shooting at White.

¶ 60 We find that Adams' unsworn 2001 affidavit is not new evidence. The offense took place in 2000 and the purported affidavit is dated March 6, 2001. Defendant's trial did not take place until 2005, thus it could have been discovered earlier. While the affidavit is material and noncumulative, it is not conclusive evidence when considered along with the trial evidence.

¶ 61 We find however, that Parker's recantation testimony is new evidence that was unavailable to defendant earlier. It was also material and noncumulative, as there was no evidence presented at trial that defendant was not involved. However, our review of Parker's testimony leads us to the conclusion that it was not conclusive enough to probably change the result on retrial. While it is true that Parker's testimony contradicts the trial testimony of White, Officer Benton, the Makowskis and Presock, but when compared to the "old" evidence presented at defendant's trial, it hardly rises to the level of actual innocence. At best, Parker's testimony amounted simply to

impeachment evidence that raised an issue of reasonable doubt, but did not vindicate or clearly exonerate defendant. See *Gonzalez*, 2016 IL App (1st) 141660, ¶ 28

¶ 62    At defendant's trial, White testified unequivocally that he knew of defendant from the neighborhood, described defendant's car, the blue Buick, as the one decedent was working on prior to his death. He also identified defendant from a photo array shortly after he was shot at, in a lineup and at trial as the person who walked towards him with a gun drawn and as the shooter. White also described a blue jacket defendant wore on the night of the shooting.

¶ 63    The Makowskis testified that they heard the gunshots, then saw two men running through her yard, one of whom was wearing a blue outfit. Tricia recognized the blue Buick from the neighborhood and saw the same two men in the car that had run through the yard.

¶ 64    Officer Benton, one of the responding officers, testified that she saw a blue Buick that she knew belonged to defendant and recognized defendant as the driver. When the Buick was curbed, Officer Benton stated that defendant got out of the car, walked towards her, and spoke to her. At that time, she noticed that he was sweaty and breathing heavily and wore an all blue outfit.

¶ 65    Additionally, Presock testified that she loaned her car to defendant on the date of the shooting. She was at the hotel with Martin, Adams, and Hardy when defendant and Parker returned together and defendant told her where she could retrieve her car, which was parked behind decedent's apartment building.

¶ 66    Considering Parker's testimony with all of the other evidence presented at trial, we agree with the trial court's determination that it was insufficient to sustain defendant's burden of proving actual innocence by a preponderance of the evidence. The trial court also made a specific factual finding that Parker's testimony was not credible. The record reveals that Parker pled guilty in 2005

just after defendant's March 2005 trial and could have come forward with the recantation at any time during the 14 years that elapsed since then. Based on the record before us, we cannot conclude that the trial court's specific factual finding that Parker was not credible was manifestly erroneous. We therefore affirm the trial court's denial of defendant's postconviction claim of actual innocence.

¶ 67                          C. Ineffective Assistance of Counsel Claim

¶ 68     Next, defendant contends that the trial court erred in denying his postconviction petition regarding his negotiated guilty plea for attempted murder because his counsel was ineffective in giving him incorrect legal advice about the calculation of credit for time served. He claims that his guilty plea was based on legal advice from his trial counsel that he would receive "simultaneous" credit for the time he spent waiting for trial and that this incorrect legal advice prompted him to change his plea to guilty. Defendant contends that he should be allowed to withdraw his guilty plea.

¶ 69     The State responds that defendant's ineffective assistance of counsel claim is frivolous because the mittimus reflected that he received credit for 2580 days served. Accordingly, if counsel provided that advice to defendant, it was not deficient and defendant was not prejudiced. The same conclusion applies to defendant's claim of "simultaneous credit." Moreover, defendant failed to produce any documentary support for his claim that an IDOC employee told him that he would not get the sentence credit, he did not develop that argument on appeal, nor did he argue that counsel told him that he would receive double credit for each day of pretrial custody, thus such arguments are forfeited.

¶ 70      As noted above, the record does not contain a copy of defendant's amended postconviction petition where defendant's ineffective assistance of counsel claims related to his guilty plea were apparently raised. However, the record does contain a copy of defendant's plea hearing and a report of proceedings related to this issue being reviewed by the trial court at the evidentiary hearing, thus we are able to determine from the record the arguments to the trial court on this issue.

¶ 71      The record reveals that the trial court found that defendant made no showing of deficient performance by counsel and indicated that it was "at a loss" as to how he was prejudiced because the mittimus reflected that he received exactly the amount of credit his counsel and the trial court told him that he would receive. The court also found that the record was clear that the sentencing court admonished defendant that the sentence was consecutive and that he was not going to get duplicate credit. The trial court concluded that defendant's plea was voluntarily and intelligently made according to the record and denied defendant postconviction relief on this issue.

¶ 72      Nevertheless, defendant contends on this appeal that he was told that he would not receive credit for the 2580 days of pretrial custody and that his guilty plea was not knowingly given if he was provided with inaccurate legal advice. He requests that he be allowed to withdraw his guilty plea and allow the solicitation case to proceed.

¶ 73      In the context of a guilty plea, counsel's conduct is deficient under the familiar *Strickland* test if the attorney failed to ensure that the defendant entered the plea voluntarily and intelligently. *People v. Brown*, 2016 IL App (4th) 140760, ¶ 23. To establish prejudice, the defendant has to show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. *Id.* With respect to the evidence needed to establish the reasonable probability for the second prong, our supreme court has stressed that a "conclusory

allegation" does not suffice in a guilty plea case. *People v. Brown*, 2017 IL 121681, ¶ 26; *People v. Jones*, 2021 IL App (1st) 182392, ¶ 44. A defendant must convince the court that a decision to reject the offered plea bargain would have been rational under the circumstances. *Jones*, 2021 IL App (1st) 182392, ¶ 44. To make this assessment, the court must compare the consequences of a defendant's conviction following a trial to the consequences of the defendant entering the guilty plea. *Id.* As this claim was denied after an evidentiary hearing, we review the trial court's conclusion, namely that defendant did not establish deficiency or prejudice by a preponderance of the evidence, for manifest error. *Pendleton*, 223 Ill. 2d at 473.

¶ 74    Upon review of the record and the circumstances surrounding defendant's guilty plea, we find that the trial court's denial of defendant's postconviction contention that he received ineffective assistance of counsel petition was not manifestly erroneous. As noted previously, while awaiting trial for the murder and attempted murder charges in the Markham lockup, defendant solicited Frazier to kill two witnesses against him. Defendant later pled guilty to a reduced charge of attempted murder along with a reduced sentence of 13 years' imprisonment. As the State points out, defendant's claim was based on the alleged statement of an IDOC employee that he would not receive his pretrial custody sentence credit, which was not supported by any documentary evidence. As noted by the trial court, this claim is directly contradicted by the transcript from the plea hearing as well as defendant's mittimus, all of which indicate that he was entitled to receive 2580 days of pretrial custody credit. Thus, counsel's statement that defendant would receive 2580 days of credit was accurate and not deficient legal advice. Defendant has failed to satisfy the first prong of *Strickland*.

¶ 75    Similarly, defendant does not satisfy the second prong of *Strickland* which requires defendant to convince the court that a decision to reject the offered plea bargain would have been rational under the circumstances. *Jones*, 2021 IL App (1st) 182392, ¶ 44. We find that defendant's rejection of the plea agreement would not have been rational under the circumstances because the minimum sentence for a conviction for solicitation of murder following a trial was more severe than the reduced sentence he received by entering the negotiated guilty plea for attempted murder. Solicitation of murder is a Class X felony with a sentencing range of not less than 15 years and not more than 30 years. 720 ILCS 5/8-1(c) (West 2010). Thus, the minimum sentence defendant could have received following a conviction for solicitation was 15 years, which is two years longer than the reduced 13-year sentence he received pursuant to his plea agreement for attempted murder. We conclude that defendant failed to show by a preponderance of the evidence that rejecting the plea agreement and reduced sentence in order to proceed with trial on the solicitation case would have been rational because he would have been subject to a harsher penalty if convicted of solicitation. Therefore, even if counsel's advice concerning the amount of pretrial credit available to defendant had been deficient, defendant could not show prejudice because there is no reasonable probability that he would have rejected the plea agreement and subjected himself to a harsher penalty by going to trial on the solicitation of murder charge. Accordingly, the trial court's rejection of defendant's postconviction arguments on this issue was not manifestly erroneous as defendant failed to establish either prong of *Strickland*.

¶ 76                                    CONCLUSION

¶ 77    For the foregoing reasons, we conclude that the trial court's decision to dismiss defendant's postconviction petition after an evidentiary hearing was not manifestly erroneous. We affirm the judgment of the circuit court of Cook County.

¶ 78    Affirmed.